Esther Frances **GESICKI** et al.,
Plaintiffs,

v.

Russell G. **OSWALD**, Commissioner of
Correctional Services, et al.,
Defendants.

No. 71 Civ. 3276.

United States District Court,
S. D. New York.

Dec. 22, 1971.

Herman Schwartz, Edward I. Koren, Buffalo, N. Y., Rhoda H. Karpatkin, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. for State of New York, New York City, Samuel A. Hirshowitz, Arlene R. Silverman, New York City, of counsel, for defendants.

Before KAUFMAN, Circuit Judge, and METZNER and LASKER, District Judges.

## OPINION

IRVING R. KAUFMAN, Circuit Judge:

This class action presents an issue of fundamental importance concerning the power of a state to enforce against juveniles a purportedly non-criminal statute which permits commitment of defendants to adult criminal correctional programs and facilities, but is impermissibly vague if judged by the standards applicable to penal laws. We hold that the particular provisions at issue, on their face, violate due process of law.

The procedural and factual background is well presented in Judge Lasker's opinion requesting that this three-judge court be convened. D.C., 336 F.Supp. 365. We need reiterate only the essential details necessary to frame the questions we now resolve.

Each of the three named plaintiffs was "deemed" by a County Court of New York State to be a "wayward minor" between the ages of 16 and 21, under N.Y.Code Crim.Proc. § 913–a(5) or (6), each having been found "morally depraved" or "in danger of becoming morally depraved." [1] As a result, each was subsequently sentenced to terms in the Albion and Bedford Hills Correctional Facilities, penal institutions for adult criminals.[2] All three have since been paroled from Bedford Hills, and each currently remains on parole status.

Plaintiffs rely on three arguments in requesting that we set aside their convictions, declare §§ 913–a(5) and (6) unconstitutional, and enjoin the further enforcement of those provisions. They urge that the provisions are unconstitutionally vague, that they permit punishment of a status or condition rather than a criminal act, and that their enforcement violates the equal protection of the laws by discriminating against 16–to–21-year olds in relation both to adults and to younger children who are not subject to the Wayward Minor statute. Since we agree with plaintiffs that the provisions under which they were convicted are unconstitutionally vague and impermissibly punish a status, we do not reach the equal protection claim.

Before discussing the merits, a threshold question is presented by plaintiffs' designation of their suit as a class action "on behalf of all persons presently serving sentences as Wayward Minors" under Section 913–a. Judge Lasker expressly reserved the determination of the propriety of the class action and the appropriate definition of the class to this court. We find that all the requisite elements for a class action are present, but only with respect to a more limited class then plaintiffs seek to represent. These litigants obviously are not appropriate representatives of any-one declared to be a "wayward minor" by virtue of any subsection other than

---

1. "Any person between the ages of sixteen and twenty-one who either . . . (5) is wilfully disobedient to the reasonable and lawful commands of parent, guardian or other custodian and is morally depraved or is in danger of becoming morally depraved, or (6) who without just cause and without the consent of parents, guardians or other custodians, deserts his or her home or place of abode, and is morally depraved or is in danger of becoming morally depraved . . . may be deemed a wayward minor." Each of these provisions states two elements in the disjunctive which together constitute "waywardness." Because we find that the repeated phrase, "morally depraved or is in danger of becoming morally depraved," is impermissibly vague, we ex-

press no opinion as to plaintiffs' assertion that the other elements of these provisions are also unconstitutional on their face.

Section 913–a was allowed by the state legislature to expire August 31, 1971, but, as Judge Lasker noted, persons found to have violated the statute before that date "remain subject to its provisions until the expiration of their term in custody, parole, or probation."

2. Plaintiffs Esther Gesicki and Dominica Morelli were both initially placed on probation. Each was subsequently found to have violated a condition of probation and sentenced to Bedford Hills. Plaintiff Marion Johnson was transferred to Bedford Hills after she had violated a condition of her parole following release from another state correctional institution.

subsections (5) and (6) under which they themselves were adjudicated. *See* Rule 23(a) (2)–(4), F.R.Civ.P.

With respect to the class of persons who have been found "wayward" under subsections (5) and (6) and are still subject to the operation of the statute, however, each of the requirements of Rule 23(a), F.R.Civ.P., are met. We are advised that it is estimated that more than 200 individuals formerly adjudicated "wayward minors" are currently incarcerated or on parole or probation, and we are not aware of any disagreement over the claim that subsections (5) and (6) were applied in a substantial number of these cases. Recourse to joinder of the members of this large class, therefore, would be impractical. In addition, since we hold the provisions in question unconstitutional on their face, the questions of law and the claims presented are identical for all members of the class. The named plaintiffs manifestly will adequately protect the class. Finally, the adjudication here with respect to the parties before us will "be dispositive of the interests of the other members" of the class. F.R.

Civ.P. 23(b)(1)(B).[3] *See also id.* 23(b) (2).

### 1. *Vagueness* [4]

■ It is clear to us that the terms "morally depraved" and "in danger of becoming morally depraved" fall far beyond the bounds of permissible ambiguity in a standard defining a criminal act. Indeed, a penal statute purporting to outlaw "evil," as these criteria essentially do, is a paradigm of a statute "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The concept of morality has occupied men of extraordinary intelligence for centuries, without notable progress (among even philosophers and theologians) toward a common understanding.

By contrast with the language in question, criteria previously found too vague to pass constitutional scrutiny are models of precision. See Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) ("conduct . . . annoying to persons passing by"); Palmer v. City of Euclid, 402 U.S. 544, 91

---

3. Defendants raise several other procedural objections. This suit was brought under both the Civil Rights Act, 28 U.S.C. § 1343(3), and the Habeas Corpus Act, 28 U.S.C. § 2254. For the reasons stated in Judge Lasker's opinion, 71 Civ. 3276, we agree that exhaustion of state judicial remedies "would have scant prospect of success," United States ex rel. Hughes v. McMann, 405 F.2d 773, 775 (2d Cir. 1968), and is therefore not required under the Habeas Corpus Act. *See* note 4 *infra.* We also agree that an order convening a three-judge court to consider plaintiffs' request for an injunction running in favor of a class was appropriate. *See* 28 U.S.C. §§ 2281, 2284; C. Wright, Law of Federal Courts § 50 (1970).

Although the record before us is not clear as to whether each named plaintiff pleaded guilty to the allegation of waywardness, in the circumstances present here we find this of little importance. The state's contention that a guilty plea waives the right to contest the constitutionality of the statute that is the basis for a conviction is without merit. A

guilty plea waives only nonjurisdictional defects. U. S. ex rel. Rogers v. Warden, 381 F.2d 209, 212–213 (2d Cir. 1967).

4. The New York Court of Appeals rejected, without setting forth its reasons, the argument that Section 913–a(5) and (6) are unconstitutionally vague in People v. Salisbury, 18 N.Y.2d 899, 276 N.Y.S. 2d 634, 223 N.E.2d 43 (1966). In recent cases postdating In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the court has refused to reconsider *Salisbury*, holding simply that determinations of waywardness were not sustained by the record. *See* People v. Gregory E. (anon.), 26 N.Y.2d 622, 307 N.Y.S.2d 465, 255 N.E.2d 721 (1970); People v. Martinez, 23 N.Y.2d 780, 297 N.Y.S.2d 144, 244 N.E.2d 711 (1968). Since these decisions illustrate only a scant number of instances, in which the Court of Appeals believed the facts established the juveniles were not included in the universe of "morally depraved" children, they do not appreciably diminish the vagueness of the class of remaining cases that *are* included.

S.Ct. 1563, 29 L.Ed.2d 98 (1971) ("suspicious person"); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) ("known to be a member of any gang"); Connally v. General Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ("not less than the current rate per diem wages in the locality where the work is performed").

To require more definite standards of criminal behavior than those at issue is hardly to require the "impossible." The cases the State relies on to buttress its argument that a penal statute is not unconstitutional merely because there are doubtful hypothetical cases at the margins of a basically clear standard, to the contrary, amply illustrate the intangible, diffuse, and chameleonic nature of the concept of "moral depravity." *See* United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947) ("unlawfully" and "by the use of  .  . force" or threat of force "to coerce, compel or constrain"); United States v. Irwin, 354 F.2d 192 (2d Cir.), cert. den., 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1965) (statute prohibited giving "anything of value to any public official").

An excellent object lesson in the lack of meaning of the challenged standards is provided by the specific allegations that were the apparent basis for the adjudications of the named plaintiffs here. The state urges that those charges—involving pregnancy out of wedlock, sexual promiscuity, *suspected* drug use and truancy—are clear instances of "moral depravity," so clear, that even if the standards are otherwise vague, when applied to these plaintiffs they are clear and certain.[5] We cannot agree.

Justice Jackson, in Musser v. Utah, 333 U.S. 95, 97, 68 S.Ct. 397, 398, 92 L.Ed. 562 (1948), described the similar phrase "injurious to public morals:"

> Standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order. In some States the phrase "injurious to public morals" would be likely to punish acts which it would not punish in others because of the varying policies on such matters as use of cigarettes or liquor and the permissibility of gambling. This led to the inquiry as to whether the statute attempts to cover so much that it effectively covers nothing. Statutes defining crimes may fail of their purpose if they do not provide some reasonable standards of guilt. See, for example, United States v. [L.] Cohen Grocery Co., 255 U.S. 81 [41 S.Ct. 298, 65 L.Ed. 516].

5. Esther Gesicki, who was living alone because her mother had been committed to a state mental hospital, was expelled from school because the school principal charged her with "sexual promiscuity" and later adjudicated a wayward minor. She was placed in a foster home. When her social worker refused to allow her to return home after her mother was released, Esther ran away. She then was sent to Albion and later to Bedford Hills for violating probation.

Marion Johnson lived in foster homes from the time she was 5. At 17, she had an out-of wedlock child. When her social worker pressured her to give up the child for adoption and she refused, Marion was adjudicated a wayward minor (she previously had run away from her foster home when she was not allowed to see the father of the child). Her social worker allegedly told her: "If you had signed the adoption papers, you wouldn't be going to Albion."

Dominica Morelli, the first of eight children, grew up in a broken home. Her mother remarried four times, and one of her stepfathers sexually assaulted her. After her mother, an alcoholic, was found to be unfit, all the children were placed in foster homes. When Dominica ran away, her mother secured a warrant for her arrest. Dominica was allowed to remain at home, but was placed under a curfew. She has no recollection of being placed on probation. After she journeyed to Williamsport, Pennsylvania, with a friend and without her mother's permission (she was suspected of having attended a drug party), she was charged with violating probation.

Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused.

### 2. *"Status"* or *"condition"*

■ In a sense, the question whether the statute is sufficiently precise to guide the actions of men of ordinary intelligence and understanding hearts misses the core of the issue raised by the language in question. By its terms, "morally depraved" does not refer to conduct at all, but to a condition or status of immorality. Thus, a second objection to subsections (5) and (6) is that they permit the unconstitutional punishment of a minor's condition, rather than of any specific actions,[6] as did the statute penalizing narcotics addiction condemned in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). In *Robinson*, the Court held "that a state law which imprisons a person [afflicted with narcotics addiction] . . . as a criminal . . . inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment . . .. Even one day in prison would be cruel and unusual punishment for the 'crime' of having a common cold." *Id.* at 667, 82 S.Ct. at 1421. Plaintiffs similarly argue that any kind of punishment for the misfortune of being a "morally depraved" minor is cruel and unusual in the constitutional sense.

### 3. *Parens Patriae rationale*

■ The state's reply to this line of argument, and implicitly to the vagueness attack as well, is that the Wayward Minor statute is not a penal statute at all, that it does not provide for criminal punishment, and hence that it is irrelevant whether as a criminal provision the standard "moral depravity" would be condemned on either asserted ground. In short, the state asserts the power of the government to act as *parens patriae* for the benefit of children and adolescents who would otherwise graduate from their youthful "wayward" tendencies to a criminal or at least unhealthy adult life. This has been the reasoning relied upon by innumerable courts in the past to sustain the constitutionality of statutes regulating or "protecting" juveniles by standards equally as vague and all-embracing as that before us. *See, e. g.,* State v. L.N., 109 N.J.Super. 278, 263 A.2d 150 (1970); People v. Deibert, 117 Cal.App.2d 410, 256 P.2d 355 (1953). It is a rationale which has its roots deep in the history of this country's praiseworthy efforts to treat *troublesome* juveniles differently than adult criminals. *See* Ex parte Crouse, 4 Whart. 9 (Pa.1838) (commitment to house of detention for "incorrigible conduct"). *See generally* Fox, Juvenile Justice Reform: An Historical Perspective, 22 Stan.L.Rev. 1187, 1198ff. (1970).

More to the point, the state's position is that the provisions of subsection (5) and (6) are constitutional for two reasons. First, it is asserted that the statute applies only to minors, as to whom the state has not only a special authority, but a positive duty, to act when parental responsibility proves insufficient. Second, we are urged to recognize that adolescents found to be "wayward minors" are treated on the basis of their individual needs, not punished (unless punishment is a prescribed "treatment"). In connection with the latter point, we are invited to take evidence that would demonstrate that the named plaintiffs, like other members of their class, receive

---

6. A finding that the juvenile has been "wilfully disobedient to the reasonable and lawful commands of parent . . ." or "without just cause and without the consent of parents . . . [deserted] his or her home" is a *sine qua non* of an adjudication of "waywardness." Since these acts, as opposed to a status, are not criminal and the State singles out for punishment only those juveniles who commit the act and in addition are "morally depraved or in danger of becoming morally depraved," the State effectively hinges punishment on the status. N.Y.Code Crim.Proc. §§ 913–a(5), (6).

such ameliorative treatment as remedial schooling and vocational training following their commitment to adult penal institutions.

For the reasons developed below, we reject these arguments and find that the statute in question is, on its face, an unconstitutionally vague penal law, regardless of the nature of the treatment actually accorded these or any other defendants adjudicated "wayward." Another way of stating our conclusion is that the statute provides wholly inadequate safeguards against arbitrary application, and insufficient guarantees that minors sentenced as "wayward" will be treated non-punitively.[7]

### 4. *The Penal Character of the "Wayward Minor" Statute*

In attempting to show that the statute is not criminal or penal, the state relies on N.Y.Code Crim.Proc. § 913–dd, which provides that an adjudication under § 913–a may not disqualify the minor from public employment or deprive him or her of any right or privilege. Nor is a wayward minor "denominated a criminal . . . nor shall such determination be deemed a conviction."

Of the two points, the second is at the same time the least tenable and the most pernicious, because it suggests that constitutional protections can be circumvented by "soft" language. Professor Lon Fuller has aptly captured in a sentence the potential for eroding due process guarantees were labels unquestionably accepted as describing reality: "When an attempt is made to hide the harsh realities of criminal justice behind euphemistic descriptions, a corrupting irony may be introduced into ordinary speech that is fully as frightening as Orwell's 'Newspeak.'" Anatomy of the Law 57 (Mentor ed., 1968). As Justice Fortas observed in a similar context, speaking (for the Court) of the discrepancy between procedures in adult and juvenile courts, "So wide a gulf between the State's treatment of the adult and of the child requires a bridge sturdier than mere verbiage. . . ."[8] In re Gault, 387 U.S. 1, 29–30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1957).

The penal character of the Wayward Minor statute is clearly indicated by several factors. It is important to distinguish the now-expired Wayward Minor statute at issue in this litigation from New York's statutory scheme for treating juvenile offenders. Except where jurisdiction in cases of unusually serious crimes is transferred to the adult courts, all offenses committed by minors under the age of 16 in New York are heard by the Family Courts. These juvenile offenders may not be incarcerated in an adult prison, and the provisions conferring jurisdiction on the Family Courts in these juvenile cases is contained in the Family Court Act, not in the Criminal Code. *See* N.Y. Family Court Act, art. 7 (McKinney's 1963).

By contrast, the Wayward Minor statute permits the incarceration of those adjudicated under it in any of the correctional institutions maintained by the State of New York for the incarceration of adult criminals, the statute itself is

---

7. We emphasize that we are not concerned here with state procedures which lead to special supervision of juveniles, and not incarceration with adult criminals. We fully recognize the justification and wisdom of identifying and affording bona fide treatment to juveniles who exhibit behavioral deviations requiring treatment and intervention without which they might, in time, become adult criminals.

8. In Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), the Court curtly dismissed an assertion that an assessment of costs permitted to be made by a jury against a defendant following his acquittal of criminal charges, guided by no standards whatever, was merely a "civil" sanction and hence not subject to the vagueness test applicable to criminal statutes:

    "Both liberty and property are specifically protected by the Fourteenth Amendment against any state deprivation which does not meet the standards of due process, and this protection is not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute." Id. at 402, 86 S.Ct. at 520.

contained in the Criminal Code, and trials are conducted in courts of general criminal jurisdiction. Confinement in an adult prison may continue for as long as three years. The New York Court of Appeals has recently drawn attention to the gulf between New York's methods of dealing with juvenile delinquents and with wayward minors:

"The public safety factors involved in [the release of "wayward minors, youthful offenders, and other young criminals"] are deemed much more important than those connected with juvenile delinquents. Rehabilitation is, of course, a factor, a hopefully desired goal, in the treatment of every type of criminal, and there are special reformative and rehabilitative measures applied and adopted to young criminals . . . Moreover, the punitive and custodial aspects of their incarceration are much more rigorous than those prescribed for juveniles and, for the State's own protection, much more closely resemble those mandated for adult criminals." (footnote omitted) Matter of Jesmer, 29 N.Y.2d 5, 10, 323 N.Y.S.2d 417, 421, 271 N.E.2d 905, 907 (1971).

### 5. Absence of Limits to Discretion

As the quotation from Jesmer suggests, it is not an acceptable answer to say that some minors found "wayward" are in fact treated appropriately for medical, psychological, or social disorders. Such instances of effective treatment, if they exist, would fail to distinguish the Wayward Minor statute from criminal legislation generally. It is safe to say that few if any prison administrators today would describe the function of the institutions they direct as entirely punitive, and most would undoubt-

edly cite "rehabilitation" or the equivalent as their most important goal. Surely the vagueness doctrine would not become obsolete if all criminal statutes were denominated "correctional statutes" and civil penalties for criminal convictions were abolished, but that is the implication of the state's argument.

It is instructive to recall in this connection that the first state institution for troublesome juveniles, the New York House of Refuge, was designed in part to "treat" youngsters through such methods as "solitary confinement, strict discipline, and a coarse diet." Fox, supra, at 1198.

Moreover, we cannot blind ourselves to the deplorable state of prisons in this country.[9] Prison focus on confinement rather than therapy and education certainly cannot be the answer to preventing juveniles from growing into adult criminals. The papers submitted to this court disclose that New York wayward minors suffer the misfortune of forced association with those who already have adopted crime as a way of life. It must be a painful experience when the Director of the State's Division for Youth, Milton Luger, is driven to state: "With the exception of a relatively few youths, it would probably be better for all concerned if young delinquents were not detected, apprehended or institutionalized. Too many of them get worse in our care." Samuels, When Children Collide with the Law, New York Times, Magazine Section 44, 146 (Dec. 5, 1971).

The central fallacy in the assertion that the statute might be viewed as the equivalent of a provision for the compulsory treatment of narcotics addiction, for example, see Robinson v. California, 370 U.S. 660, 665, 82 S.Ct. 1417, 1419, 8 L.Ed.2d 758 (1962),[10] is that the

9. The disastrous state of neglect and disrepair of even some institutions designed especially for youth is well documented, see Forer, No One Will Lissen (1970) (especially Chapter 7, "The Myth of Treatment"); James, Children in Trouble: A National Scandal 88–126 (1970); Samuels, When Children Collide with the Law, New York Times, Magazine Section

(Dec. 5, 1971); Task Force on Juvenile Delinquency and Youth Crime, President's Commission on Law Enforcement and Administration of Justice, Report 8 (1967).

10. "[I]n the interest of the general health or welfare of its inhabitants, a State might establish a program of compulsory treatment for those addicted to narcotics."

statute fails to require any course of treatment at all. Specifically, *there is no assurance that wayward minors will be given special treatment substantially distinguishable from that accorded to criminals and reasonably related to the condition upon which the adjudication of waywardness is based.*[11] Absent such a minimal guarantee against arbitrary application of the statute, the juvenile must rely on the good intentions and skills of courts and administrators. But "unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure." In re Gault, *supra,* 387 U.S. at 18, 87 S.Ct. at 1439. Like the statute at issue in *Robinson,* the wayward minors statute "is not a law which even purports to provide or require medical treatment." 370 U.S. at 666, 82 S.Ct. at 1420.

▆ That these plaintiffs are juveniles does not render the failure to guard against arbitrariness any less intolerable. In McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the Supreme Court held that juveniles do not have a constitutional right to a jury trial in delinquency proceedings, thus finding that not all the safeguards afforded adults in criminal trials apply to juvenile proceedings. But, as we have observed, the wayward minor statute does not establish a juvenile delinquency proceeding. It is substantially equivalent to a criminal statute. Moreover, in *McKeiver,* Justice Blackmun speaking for the Court reaffirmed that "the applicable due process standard in juvenile proceedings . . . is fundamental fairness." 403 U.S. at 543, 91 S.Ct. at 1985. We are told, however, that lack of specificity in a penal statute "violates the first essential of due process of law," Connally v. General Constr., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). "One cannot measure our just treatment with a yardstick made of rubber." L. Fuller, *supra,* at 56. A statute indistinguishable in any substantial respect from a criminal provision, which fails to define the conduct that will bring a juvenile within its reach with sufficient specificity to protect against arbitrary application and to alert the malefactor to the conduct proscribed, does not comport with fundamental fairness.[12]

---

11. *Cf.* National Conference of Commissioners on Uniform State Laws, Uniform Juvenile Court Act § 2(3) (Approved Draft 1968) defining a delinquent child as one, *inter alia,* "in need of treatment or rehabilitation." *See also id.* § 33(a): A child shall not be committed or transferred to a penal institution or other facility used primarily for the execution of sentences of persons convicted of a crime." *See also* U.S. Dep't of H.E.W., Children's Bureau, Legislative Guide for Drafting Family and Juvenile Court Acts § 34(d) (substantially equivalent to Section 33(a) of the Uniform Act). Transferring juvenile offenders to adult prisons is universally condemned by commentators. *See* Dorsen & Rezneck, In re Gault and the Future of Juvenile Law, 1 Fam.L.Q. 1, 45–46 & n. 174 (Dec. 1967).

We do not intend to intimate that a statute which does provide sufficient guarantees against arbitrariness on its face would be immune from attack as failing to provide treatment in practice. *See, e. g.,* Rouse v. Cameron, 125 U.S. App.D.C. 366, 373 F.2d 451 (1966); Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966). *See generally,* Note, The Nascent Right to Treatment, 53 Va.L.Rev. 1134 (1967).

12. *See* People v. Munoz, 9 N.Y.2d 51, 211 N.Y.S.2d 146, 172 N.E.2d 535 (1961), holding unconstitutional for vagueness a New York City Administrative Code provision permitting criminal prosecution of minors under 21 years of age who carried "any knife or sharp pointed or edged instrument . . . ." "Juvenile delinquents," the court observed, "can be highly dangerous, especially in large cities. They cannot be legislated out of existence, however, *nor be held guilty of offenses on the sole basis of status,* or except insofar as they may be found guilty from their conduct of violating criminal or quasi-criminal statutes that are sufficiently definite so that one may know in advance what is prohibited . . . ." *Id.* at 60, 211 N.Y.S. 2d at 153, 172 N.E.2d at 540 (emphasis added). The court concluded that "The purpose to be served by this enactment could only be to enable prosecution of those whom the police believe to be bad boys and girls." *Id.* at 58, 211 N.Y.S.2d at 151, 172 N.E.2d at 539.

### 6. *Conclusion*

For the reasons stated, we set aside the convictions of the named plaintiffs and all members of the class they represent, declare former N.Y.Code Crim. Proc. §§ 913–a(5) and (6) unconstitutional, and enjoin defendants, their employees, agents, successors and all persons in active concert and participation with them, from enforcing these provisions.